**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Aerel, S.R.L., | ) | CASE NO. 1:04 CV 0744 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| PCC Airfoils, L.L.C., | ) | **Memorandum of Opinion & Order** |
| | ) | |
| Defendant. | ) | |

**Introduction**

This matter is before the Court upon the following motions: (1) defendant PCC Airfoils, L.L.C.'s Motion for Summary Judgment (Doc. 28); (2) plaintiff Aerel, S.R.L.'s Cross-Motion for Partial Summary Judgment (Doc. 32); and (3) defendant PCC Airfoils, L.L.C.'s Motion to Strike Aerel's Improper Sur-Reply (Doc. 35).  This is a breach of contract action arising out of the parties' sales representative agreement. The issue presently before the Court is whether the plaintiff is entitled to commissions relating to sales which it procured during the contract term but which were not delivered and/or paid for until after the termination of the parties' contractual relationship.  For the following reasons, the Court (1) grants defendant PCC Airfoils, L.L.C.'s

1

Motion for Summary Judgment; (2) denies plaintiff Aerel, S.R.L.'s Cross- Motion for Partial Summary Judgment; and (3) denies defendant PCC Airfoils, L.L.C.'s Motion to Strike.

**Facts**

Defendant PCC Airfoils, L.L.C (hereinafter "PCC") is a limited liability company existing under the laws of the State of Ohio.[1] (Complt. at ¶ 2). It casts intricate geometric blades, vanes and vane segments for the high-temperature turbine section of jet engines and power generation equipment. Plaintiff Aerel, S.R.L. ("Aerel") has been engaged as a sales agent for PCC, as described below.

The parties entered into their first written Sales Representation Agreement in July 1987 (hereinafter "1987 Agreement"). According to this Agreement, Aerel was paid on a commission basis. With regard to commission payments, and as relevant to the claims herein, the 1987 Agreement provides as follows:

> 5-C  Upon termination of this AGREEMENT, PCC Airfoils, Inc. [sic] obligation to pay commission on sales of PRODUCT promoted by AEREL hereunder shall cease **except AEREL shall be paid commission on purchase orders then in force for castings to be delivered up to 18 months after the termination of the contract where the PRODUCTS covered thereby have not been delivered or paid for**. No commission shall be paid to Aerel unless payment in full has been received by PCC Airfoils, Inc. in United States Dollars.

*See* 1987 Agreement (attached as Exh. A to defendants' Motion for Summary Judgment) (emphasis added). The 1987 Agreement was in effect from July 1987 until December 31, 1989.

In January 1990, the parties extended the Sales Representation Agreement (with certain

---

[1]  Plaintiff alleges that defendant PCC Airfoils, L.L.C. is the surviving entity of a March 2002 merger with PCC Airfoils, Inc. and is the successor entity to PCC Airfoils, Inc.'s rights and liabilities. (Complt. at ¶ 2). Defendant PCC does not dispute this allegation.

2

modifications not relevant herein) through December 31, 1992 (hereinafter "1990 Agreement"). The parties extended their contractual relationship again via Agreements dated February 17, 1993 (hereinafter "1993 Agreement") and December 5, 1995 (hereinafter "1995 Agreement"). After the expiration of the 1995 Agreement, Aerel continued to act as a sales agent for PCC but the parties operated without a written contract. This arrangement continued from January 1999 through July 2000.

The 1990, 1993 and 1995 Agreements each contain the same provision as set forth in 1987 Agreement (and reproduced above) regarding payment of commissions for up to 18 months after the termination of the contract (hereinafter "the 18-month provision"). In addition, PCC states that it continued to pay Aerel commissions consistent with the 18-month provision during the time period when the parties operated without a written contract.

In July 2000, the parties entered into a new Sales Representation Agreement (the "2000 Agreement"). This Agreement was in effect from July 2000 until December 31, 2002. The 2000 Agreement changed the provision contained in the prior Agreements regarding the payment of commissions after termination of the contract as follows:

> 5-B  Upon termination of the Agreement, PCC AIRFOILS, INC. [sic] obligation to pay commission on sales of Products promoted by AEREL hereunder shall cease.

*See* 2000 Agreement (attached as Exh. H to defendant's Motion for Summary Judgment).

Aerel's principal, Luciano Cosentini, testified in deposition that he was aware of the change to the contract, and that he was unhappy that the 18-month provision was not included in the 2000 Agreement. (Cosentini Depo. at 35, 40). However, in an Affidavit submitted with Aerel's Brief in Opposition to defendant's Motion for Summary Judgment and Cross-Motion for

3

Partial Summary Judgment, Mr. Cosentini explains that the above Paragraph 5-B was included as part of negotiations regarding a commission "tail." Specifically, Mr. Cosentini avers that:

> 3. During the negotiation of the 2000 written contract, I requested a commission "tail," a provision in the contract that would have allowed Aerel to collect commissions on PCC's sales to Italian customers that were negotiated and procured by PCC staff, and not by Aerel, after the contract expired.
>
> 4. I suggested that Aerel was entitled to this "tail" in recognition of the fact that Aerel developed and [sic] grown the Italian market for PCC's products.
>
> 5. During negotiations, PCC rejected my proposal, and instead agreed to the language in the written contract.

*See* Cosentini Aff. at ¶¶ 3-5. Mr. Cosentini further states that, regardless of these negotiations, he understood that Aerel would be entitled to commissions for sales that originated in Italy during the contract term, but were not delivered to Italy until after the contract term. *Id*. at ¶ 6. He further avers that PCC's Sales Director, Alan Peterson, confirmed this understanding during and after negotiation and execution of the written contract. *Id.* at ¶ 7. Apparently in reliance on this understanding, Aerel proceeded to negotiate long-term blanket purchase orders with at least two major Italian clients, FiatAvio and Nuovo Pignone. *Id*. at ¶ 8.

After the 2000 Agreement expired on December 31, 2002, PCC decided not to renew Aerel's contract. *Id*. at ¶ 12. PCC's sales under the blanket purchase orders negotiated by Aerel continued, however, and totaled over $30 million in 2003 and over $2 million in 2004. *Id*. at ¶¶ 13, 15. Aerel claims that it is entitled to its commissions on these sales as well as all such sales that occur in 2005. PCC disagrees, arguing that the 2000 Agreement specifically provides that PCC's obligation to pay commissions terminated once the Agreement expired.

Aerel filed suit in this Court on April 21, 2004. The Complaint alleges three counts.

4

Count One alleges breach of contract.  Count Two alleges quasi-contract.  Count Three alleges unjust enrichment.

PCC filed its Motion for Summary Judgment on March 15, 2005.  Aerel thereafter filed its Brief in Opposition to defendant's Motion for Summary Judgment and Cross-Motion for Summary Judgment on April 14, 2005.  It is these Motions that are currently before the Court.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).  The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)).  A fact is "material only if its resolution will affect the outcome of the lawsuit."  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party.  Federal Rule of Civil Procedure 56(e) provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of [his] pleadings, but [his response], by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is genuine issue for trial.  If he does not respond, summary judgment, if appropriate, shall be

5

> entered against him.

The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citation omitted); *see also United States v. Hodges X-Ray, Inc.,* 759 F.2d 557, 562 (6th Cir. 1985). However, the nonmoving party may not simply rely on its pleadings, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox*, 53 F.3d at 150.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Accordingly, "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 52 (1986)). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

**I.     Breach of Contract (Count One)**

In its Motion for Summary Judgment, defendant PCC argues that the 2000 Agreement clearly and unambiguously provides that Aerel is not entitled to commissions after the termination of the Agreement. Specifically, PCC maintains that Paragraph 5-B was added to the 2000 Agreement to address the precise issue before the Court, and that this Paragraph is unambiguous in limiting Aerel's entitlement to post-termination commissions. Moreover, PCC

6

notes that Aerel's principal, Mr. Cosentini, testified that he was aware of Paragraph 5-B's inclusion in the 2000 Agreement and that, although he was not happy about it, he nevertheless voluntarily signed the Agreement. (Cosentini Depo. at pp. 35, 38, 40). PCC further notes Mr. Cosentini's testimony that the 2000 Agreement was a new agreement, and not an extension of the parties' earlier Agreements. (Cosentini Depo. at 34). Thus, PCC maintains that this Court should give effect to the clear, unambiguous language of the 2000 Agreement and enter judgment in its favor as a matter of law.

Plaintiff Aerel argues the following in response. First, Aerel agrees that the 2000 Agreement is unambiguous, but argues that a separate paragraph of the Agreement (Paragraph 2-G) unambiguously entitles it to commissions on "all sales originating from" Italy. This Paragraph, set forth in full below, recites the specific commission percentages that PCC is required to pay Aerel "on all sales originating from the Territory."[2] *See* 2000 Agreement at Paragraph 2-G.

With regard to Paragraph 5-B, Aerel maintains that Paragraph 5-B was included in the 2000 Agreement in response to Aerel's request for a commission "tail" and was meant only to prevent Aerel from seeking commissions on sales that had been previously "promoted" by Aerel but were now being handled by PCC's in-house staff. *See* Cosentini Aff. at ¶¶ 3-5. Accordingly, Aerel argues that Paragraph 5-B is simply not applicable to the situation herein, i.e., where Aerel itself negotiated and secured the blanket purchase orders at issue during the contract term. Rather, it maintains that the more general provision of Paragraph 2-G (that Aerel is entitled to

---

[2] The term "Territory" is defined in the 2000 Agreement as meaning Italy. *See* 2000 Agreement at Paragraph 1-B.

commissions on "all sales originating from" Italy) is applicable and unambiguously entitles it to the commissions at issue.  Thus, Aerel maintains that it is entitled to partial summary judgment in its favor on liability as a matter of law.

In the alternative, Aerel argues that the Court should find the 2000 Agreement to be ambiguous.  In support of this argument, Aerel relies on the following provisions in the Agreement:

> 2-F  PCC AIRFOILS, INC. agrees to pay AEREL in full under terms of net thirty (30) days from the date of receipt of payment to PCC AIRFOILS, INC. from the customer.
>
> 2-G  On all sales originating from the Territory, PCC AIRFOILS, INC. shall pay AEREL as follows:
>
> | | | |
> |---|---|---|
> | 1. | Tooling and fixtures | 0% |
> | 2. | Commission to be paid for CF6-80C2 and GE90 airfoils sold to any Italian customer will not exceed | 2% |
> | 3. | Castings for any other program of PCC AIRFOILS, INC. | 4% |
> | 4. | It is understood that higher or lower commissions may be required with regard to certain products or services, by mutual agreement. | |

*See* Paragraphs 2-F and 2-G of the 2000 Agreement.

Aerel maintains that, when taken in conjunction with the above paragraphs, Paragraph 5-B is ambiguous and must be construed against the drafter, i.e., against PCC.  Specifically, Aerel argues that Paragraph 5-B's limitation on the payment of commissions conflicts with the provision in Paragraph 2-F that commissions are to be paid 30 days from receipt of payment by PCC from the customer.  Moreover, Aerel argues that the Agreement's ambiguity is further demonstrated by the use of the term "originating" in Paragraph 2-G since that term is not defined

8

in the Agreement and could mean "ordered" or "ordered and manufactured" or "ordered, manufactured, and shipped," etc. Thus, Aerel maintains that the 2000 Agreement is ambiguous and this Court should find as a matter of law that Aerel is entitled to the commissions at issue.

Finally, Aerel argues that, even if the Court rejects all of its arguments (above), the Court should find that summary judgment is inappropriate because the parties orally modified the 2000 Agreement. In support of this argument, Aerel relies on the following averment in Mr. Cosentini's Affidavit:

> 11. During the contract term, I was repeatedly told that Aerel would earn commissions on all sales resulting from the purchase orders it negotiated and obtained during the contract term. I believed that this either confirmed my interpretation of the written contract, or modified the written contract to match my previous interpretation.

Cosentini Aff. at ¶ 11. Based on the above, Aerel argues that this Court should deny PCC's motion for summary judgment and proceed to trial.

In response, PCC first maintains that Aerel's Cross-Motion for Partial Summary Judgment (filed April 14, 2005) should be disregarded because it was filed after the March 15, 2005 dispositive motion deadline set by this Court. (PCC's Reply Brief at 1, fn 1). Next, PCC argues that Aerel's reliance on Paragraphs 2-F and 2-G is misplaced. PCC maintains that, when read in context, it is clear that Paragraph 2-F addresses the time to pay commissions *during* the contract term; Paragraph 2-G addresses the *amount* of commissions to be paid; and Paragraph 5-B addresses PCC's duty to pay commissions *after* the termination of the contract. Because Paragraph 5-B specifically addresses the issue of post-termination commissions, PCC argues that that Paragraph controls over Paragraph 2-F's general payment provision. Finally, with regard to the oral modification issue, PCC argues that this Court should disregard Mr. Cosentini's

9

Affidavit because it conflicts with his previous deposition testimony.

The parties agree, and the 2000 Agreement expressly provides, that Ohio law governs this dispute. *See* 2000 Agreement at ¶ 6-H (providing that "[a]ny dispute shall be governed by Ohio law and processed through Ohio court").   Under Ohio law, "the primary and paramount objective" in construing any written instrument is to ascertain and give effect to the intent of the parties. *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 544 N.E.2d 920, 923 (Ohio 1989). *See also Foster Wheeler Envirresponse, Inc. v. Franklin County Convention Facilities Authority*, 678 N.E.2d 519, 526 (Ohio 1997). Where the terms of a contract are clear and unambiguous, the Court presumes that the parties' intent resides in the words utilized in the agreement. *Gencorp, Inc. v. American Int'l Underwriters*, 178 F.3d 804, 817-18 (6th Cir. 1999). "[I]f the meaning of the contract is apparent, the terms of the agreement are to be applied, not interpreted." *Id*. "Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered to give effect to the parties' intentions." *Shifrin v. Forest City Enterprises, Inc.*, 597 N.E.2d 499, 501 (Ohio 1992).

"The question of whether the language of an agreement is ambiguous is a question of law." *United States v. Donovan*, 348 F.3d 509, 512 (6th Cir. 2003) (*citing Parrett v. Am. Ship Bldg. Co.*, 990 F.2d 854, 858 (6th Cir. 1993)).  Under Ohio law, common words appearing in the contract "will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument." *Id*. (internal quotation and citation omitted).  Extrinsic evidence purporting to demonstrate the parties' intent cannot be considered in determining whether a contract is ambiguous. *Schachner*

10

*v. Blue Cross and Blue Shield of Ohio*, 77 F.3d 889, 893 (6th Cir. 1996); *See also Ed Schory & Sons, Inc. v. Society National Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996).  Thus, a court can consider extrinsic evidence only upon a finding that the language is ambiguous.  Once a finding of ambiguity is made, interpretation of the contract will generally become a question of fact for the jury.  *Gencorp*, 178 F.3d at 818.

For the following reasons, the Court finds that the 2000 Agreement is unambiguous and clearly provides that Aerel is not entitled to commissions after the termination of the contract. By its express terms, Paragraph 5-B specifically addresses the issue of post-termination commissions.  In clear and straightforward terms, it provides that PCC's obligation to pay commissions on sales promoted by Aerel "shall cease" upon termination of the Agreement.  The Court finds there is nothing ambiguous about this language and that the limitation on Aerel's entitlement to post-termination commissions is apparent from the plain language of the Agreement.

In addition, the Court rejects Aerel's argument that Paragraphs 2-F and 2-G conflict with Paragraph 5-B and, therefore, create ambiguity regarding Aerel's entitlement to post-termination commissions.  As PCC correctly notes, when the Agreement is read as a whole, it is apparent both from the sequence of these contractual provisions and their content that Paragraph 2-F applies to PCC's general duty to remit payment during the contract term, and that Paragraph 2-G addresses the amount of commissions to be paid on sales falling within the Agreement.  *See Foster Wheeler*, 678 N.E.2d at 526 (holding that a contract "will be read as a whole, and the intent of each part will be gathered from a consideration of the whole").

Specifically, Paragraphs 2-F and 2-G appear in a beginning section of the Agreement

11

which addresses (among other things) the issues of the appointment of Aerel as exclusive sales representative for PCC within the Territory; PCC's acceptance of orders resulting from Aerel's efforts; the manner in which prices shall be quoted; and PCC's obligations to respond to and ship orders promoted by Aerel in a timely fashion.  Each of these provisions in this section clearly govern various aspects of the parties' dealings during the contract term.  By contrast, Paragraph 5-B appears much later in the Agreement and in a section in which there are two provisions (Paragraphs 5-A and 5-B) that both expressly address the issue of termination.  In light of the above, the Court finds that Paragraph 5-B is not rendered ambiguous by virtue of the provisions in Paragraphs 2-F and 2-G.[3]

The Court further finds that Aerel's reliance on *Harry W. Applegate, Inc. v. Stature Electric, Inc.*, 275 F.3d 486 (6th Cir. 2001) is misplaced. In that case, plaintiff (a sales representative) brought a breach of contract action against defendant.  Therein, plaintiff alleged that it was entitled to commissions for goods paid for after termination but released under blanket purchase orders that were procured by plaintiff and in place prior to termination.  *Id*. at 488.  Applying New York law, the Sixth Circuit found that plaintiff was entitled to commissions ordered before but paid for after termination, but so held because there was no provision to the contrary in the parties' Agreement:

---

[3] This finding is further supported by the fact that Aerel's contention that Paragraph 2-F should be read to require PCC to pay post-termination commissions would effectively nullify Paragraph 5-B and render it meaningless.  Such a result is contrary to established rules of contract interpretation.  *See Foster Wheeler*, 678 N.E.2d at 526 (providing that "[i]n the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain").

> The language of the Agreement provides for payment of commissions to the Plaintiff after the Defendant has received payment, but is ambiguous as to whether the Plaintiff's right to receive commissions on placed specific orders is cut off by termination because the Defendant has not received payment. **Because the Agreement does not clearly provide a contrary provision**, we must follow New York law. As a result, the Plaintiff is entitled to commissions on specific orders for goods placed prior to [the termination of the Agreement].

*Id.* at 489 (emphasis added).

The Court finds that the instant case is distinguishable from *Applegate*. Unlike the parties' agreement in *Applegate*, the 2000 Agreement between the parties herein does contain a specific provision, unambiguous in its terms, that expressly addresses the issue of post-termination commissions and provides that Aerel is not entitled to such commissions. As such, the Agreement in the instant case is materially different from the contract at issue in *Applegate*, rendering that decision distinguishable.

Finally, the Court rejects Aerel's argument that Paragraph 5-B was intended to address Aerel's request for a commission "tail," for the reason that this argument relies entirely on extrinsic evidence to prove the intent of the parties. Although Aerel has submitted affidavit and deposition evidence in support of its argument,[4] the Court finds that it cannot consider such evidence unless it first concludes that the language of Paragraph 5-B is susceptible to more than one reasonable interpretation. For the reasons set forth above, the Court finds that the language of the 2000 Agreement with regard to the issue of post-termination commissions is unambiguous, and that the Court is able to construe the Agreement without resorting to extrinsic evidence.

---

[4] Specifically, Aerel relies on (1) the Affidavit of Mr. Cosentini, who avers that Paragraph 5-B was included in response to Aerel's request for a commission "tail;" and (2) deposition testimony of PCC Sales Director Alan Peterson regarding the parties' intent in including the 18-month provision in the parties' 1987 Agreement. *See* Peterson Depo. at 39.

13

Accordingly, the Court rejects Aerel's argument that the parties intended Paragraph 5-B to address the issue of Aerel's entitlement to a commission "tail" on certain sales handled by PCC's in-house staff.

Thus, for all the reasons set forth above, the Court finds that Paragraph 5-B of the 2000 Agreement is unambiguous and provides that Aerel is not entitled to post-termination commissions.

Aerel, however, argues that, even assuming the 2000 Agreement is unambiguous in PCC's favor, the parties orally modified it to allow Aerel to collect the post-termination commissions at issue herein. As set forth above, Aerel's only evidence of this alleged oral modification is Mr. Cosentini's Affidavit, which avers generally that "I was repeatedly told that Aerel would earn commissions on all sales resulting from the purchase orders it negotiated and obtained during the contract term. I believed that this either confirmed my interpretation of the written contract, or modified the written contract to match my previous interpretation." Cosentini Aff. at ¶ 11.  In addition, Mr. Cosentini avers that PCC's Sales Director, Alan Peterson, confirmed Cosentini's understanding that Aerel would be entitled to post-termination commissions "during and after negotiation and execution of the written contract."  *Id*. at ¶ 7.

PCC argues that Mr. Cosentini's Affidavit directly contradicts his previous deposition testimony and, therefore, should be disregarded.  Specifically, PCC argues that Mr. Cosentini's averments that Paragraph 5-B was intended to prevent Aerel from seeking a commission "tail" contradict his sworn deposition testimony that (1) he was aware that the 2000 Agreement did not provide for payment of commissions for 18 months after termination; (2) he was unhappy with this change; but (3) he nevertheless voluntarily signed the Agreement.  (Cosentini Depo. at 35,

38, 40). PCC maintains that Aerel should not be permitted to create a fact issue by submitting Cosentini's affidavit after summary judgment motions had already been filed.

In response, Aerel argues that Cosentini's Affidavit does not contradict his deposition testimony. Aerel maintains that "[n]othing in [Cosentini's] deposition testimony discusses the substance of his affidavit, which involve [sic] his interpretation of the agreed contract language and his belief about PCC's interpretation of the agreed contract language." (Plaintiff's Reply Brief in Support of Cross-Motion for Summary Judgment at 3). Thus, Aerel argues that Cosentini's Affidavit should not be stricken. Moreover, Aerel argues that, even if the affidavit does contradict portions of the deposition testimony, that does not justify striking the entire affidavit. Rather, the Court should only strike those averments which it deems contradict Mr. Cosentini's deposition testimony.

It is well-established in the Sixth Circuit that a party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts his earlier deposition testimony. *See, e.g., Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986); *Penny v. United Parcel Serv.*, 128 F.3d 408, 416 (6th Cir. 1997); *Lockard v. General Motors Corp.*, 2002 WL 31780957 at ** 7 (6th Cir. Dec. 11, 2002). Moreover, the Sixth Circuit has held that "the fact that a party has had ample opportunity during discovery to present evidence provides courts with reason to prevent that party from introducing new evidence in an affidavit opposing summary judgment." *Lockard*, 2002 WL 31780957 at **7. *See also Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir. 1984); *Rosinski v. Electronic Data Systems Corp.*, 1991 WL 105747 (6th Cir. June 18, 1991).

For the following reasons, the Court strikes Paragraphs 7 and 11 of Mr. Cosentini's

15

Affidavit. Although these averments (set forth above) do not represent a direct contradiction between Cosentini's Affidavit and prior deposition testimony, Aerel's claim that the parties orally modified the Agreement to provide for post-termination commissions points to a significant omission in Cosentini's deposition. Mr. Cosentini was deposed at length regarding the precise issue of Aerel's entitlement to such commissions under the 2000 Agreement at a time when Aerel had the opportunity to fully develop a record in support of its claim. However, the parties do not cite any deposition testimony where Mr. Cosentini mentions or discusses the alleged oral modifications that Aerel now claims occurred. The Court finds that, under these circumstances, Aerel cannot now create a fact issue where none had existed prior to Cosentini's affidavit. The Sixth Circuit has reached the same conclusion on similar facts. *See, e.g., Smith v. Consolidated Rail Corp.*, 1996 WL 366283 at \*\*4 (6th Cir. June 28, 1996) (affirming district court's decision to strike plaintiff's affidavit where plaintiff offered basis for his claim for the first time in his affidavit, stating that "if Smith had hypotheses about the cause of his fall, he was required to say so at his deposition when he was specifically questioned on the subject"); *Rosinski*, 1991 WL 105747 at \*\*6 (affirming district court's decision to strike plaintiff's affidavit where, although not directly contradictory to prior deposition testimony, affidavit "points to a significant omission in Rosinski's deposition").

Accordingly, the Court strikes Paragraphs 7 and 11 of Cosentini's Affidavit. In the absence of this affidavit testimony, Aerel has no evidence to support its claim of oral modification. Thus, the Court rejects Aerel's argument that the parties orally modified the 2000 Agreement to provide for the payment of post-termination commissions.

For the reasons set forth above, the Court grants summary judgment in PCC's favor on

16

Count One of Aerel's Complaint.  In addition, the Court denies Aerel's Cross-Motion for Summary Judgment on this same claim.[5]

## II. Quasi-Contract and Unjust Enrichment (Counts Two and Three)

Defendant PCC also moves for summary judgment in its favor on Aerel's quasi-contract and unjust enrichment claims on the grounds that such claims are barred since the subject of post-termination commissions is covered by an express contract between the parties.

Aerel does not oppose PCC's motion for summary judgment on these claims.

Ohio law is clear that a plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject. *Ullmann v. May*, 72 N.E.2d 63 (Ohio 1947), *paragraph four of the syllabus*. *See also Joseph Oldsmobile/Nissan, Inc. v. Tom Harrigan Oldsmobile, Inc.*, 1995 WL 276804 (Ohio App. 2nd Dist. May 10, 1995) (citing *Williams v. Goodyear Aircraft Corp.*, 85 N.E.2d 601 (Ohio App. 9th Dist. 1948)); *City of Cincinnati v. Cincinnati Reds*, 483 N.E.2d 1181 (Ohio App. 1st Dist. 1984)); *Randolph v. New England Mut. Life Ins. Co.*, 526 F.2d 1383, 1387 (6th Cir. 1975).

In light of the lack of opposition and the undisputed fact that the 2000 Agreement expressly covers the issue of post-termination commissions, the Court grants summary judgment in PCC's favor as to Counts Two and Three of Aerel's Complaint.

**Conclusion**

---

[5] PCC is correct that Aerel's Cross-Motion for Summary Judgment is untimely. However, as both PCC's and Aerel's motions address the same issues, the Court will address Aerel's Cross-Motion here on the merits.  Accordingly, the Court will deny PCC's Motion to Strike Aerel's Improper Sur-Reply, since the "Sur-Reply" is, in fact, Aerel's Reply Brief in Support of its Cross-Motion for Summary Judgment.

For the reasons set forth above, the Court (1) grants defendant PCC's Motion for Summary Judgment; (2) denies plaintiff Aerel's Cross-Motion for Summary Judgment; and (3) denies defendant PCC's Motion to Strike Aerel's Improper Sur-Reply.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 5/31/05